CANADIAN NATIONAL RAILWAY

v.

Phineas SPRAGUE, Sr.

and

Portland Yacht Services, Inc.

Supreme Judicial Court of Maine.

Argued March 4, 1992.
Decided June 30, 1992.

E. Stephen Murray (orally), Murray, Plumb & Murray, Portland, for appellant.

Deborah M. Mann (orally), Jensen, Baird, Gardner & Henry, Portland, for appellee.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD and COLLINS, JJ.

COLLINS, Justice.

Phineas Sprague, Sr. and Portland Yacht Services, Inc. (Sprague) appeal from a judgment entered in the Superior Court (Cumberland County, *Alexander, J.*), adopting a referee's report in which the referee found that Sprague's easement across Canadian National Railways' (CNR) property had been abandoned and extinguished. On appeal, Sprague argues that the referee premised its conclusions of law on several clearly erroneous findings of fact and that the Superior Court erred in refusing to reach the merits of some of Sprague's objections to the referee's report. We affirm the judgment.

In 1845, the Maine Legislature gave the Atlantic and St. Lawrence Rail Road Co. (A. & St.L.R.R. Co.) permission to construct a railroad from Portland to the Canadian border. The railroad was designed to link Portland with Montreal. The A. & St. L.R.R. Co. was given the authority to condemn private property in order to lay the tracks. It was also given the authority to cross state-owned submerged lands. Where the A. & St.L.R.R. Co. built bridges crossing tidal waters it had to avoid unnecessary interference with the navigation of those waters.

In 1846, the Legislature gave the A. & St.L.R.R. Co. the authority to condemn additional property on the Portland waterfront for the construction of a railroad station. The A. & St.L.R.R. Co. was also given express authority to build a sea wall and docking facility.

The Portland Company was a foundry. The foundry was located on Portland's waterfront. The foundry was to the east of the station and its property abutted that of the A. & St.L.R.R. Co. The Portland Co. manufactured heavy equipment for the railroad and shipping industries and owned a wharf that it used to load and unload its goods.

In 1848, the A. & St.L.R.R. Co. built a trestle bridge over the tidal waters that ran from a point a little to the west of the station along the waterfront in front of the foundry and further east to a point of land. The bridge cut off all seaward access to the Portland Co.'s wharf. The Portland Co. built a new wharf that extended further into the harbor, ending near the bridge, and proceeded to load its goods over the bridge.

The Portland Co. applied to the County Commissioners for relief, citing existing laws that guaranteed riparian owners access to the harbor and the 1845 Act that required the A. & St.L.R.R. Co. to compensate private property owners for any land taken for the construction of the railway. In 1850, the A. & St.L.R.R. Co and the foundry negotiated an agreement. The agreement gave the foundry the right to extend a 150 foot-wide wharf from the shore to the trestle and beyond, incorporating the tracks into the dock. Portland Co. was granted an easement and the right to

build a single track from its foundry, across the A. & St.L.R.R. Co.'s tracks and out onto the wharf.

The A. & St.L.R.R. Co. then built a sea wall on the seaward side of the trestle bridge and proceeded to fill the land on the leeward side. Over a period of six years both the A. & St.L.R.R. Co. and Portland Co. filled in the leeward property until what once was a bridge became a causeway.

In 1865, the Grand Trunk Rail Road, the new owner of the railway, and the Portland Co., which at that time was building locomotives for Grand Trunk, exchanged documents that expanded on the 1850 agreement. That agreement established a boundary line between Grand Trunk and the foundry on the filled lands. The land from the sea wall to the new boundary line belonged to Grand Trunk and encompassed the tracks. The Portland Co. retained the right to cross Grand Trunk's property to reach its dock and the ocean.

Between 1865 and 1871, the Portland Co. filled in and improved its wharf on the seaward side of the sea wall. This filled area became known as the wharf head and contained buildings as late as 1940. The wharf head is 150 feet wide and extends 15 feet into the harbor. It is currently used by Sprague as a location for a cement pad and crane, and as an anchor for ramps leading to Sprague's marina.

The railroad property has changed hands several times and is now owned by CNR. The Portland Co.'s property also changed hands several times and in 1973 was owned by United Industrial Syndicate (UIS). In 1973, the State of Maine began planning a marine terminal on Portland's waterfront. The terminal was to be located in front of the CNR and UIS properties. CNR gave the State a deed, transferring its rights to all submerged, unfilled lands fronting its property and some upland including a strip of upland 26 feet wide, abutting the sea wall and to the west of UIS. UIS gave the State a deed to all its rights in the submerged unfilled lands in front of its property, the wharf head, and all its rights in a 26 foot-wide strip in front of its property (of which CNR was the record owner). The result of the two transactions was that the State owned the property along the sea wall to the west of UIS's property, but only owned an easement across CNR's waterfront property in front of UIS. In 1974, the State abandoned its plan for the terminal and transferred its title to the waterfront lands to the City of Portland. In 1987, CNR abandoned its tracks in front of Sprague's property.

Sprague purchased the UIS property in 1978. Sprague negotiated a lease with the State for the use of filled and unfilled submerged lands in front of its property and to the seaward side of CNR's property. The lease was for the same area that Sprague's predecessors in title had been granted access to by the A. & St.L.R.R. Co. and Grand Trunk in the 1850 and 1865 agreements. The lease is in effect until 1998.

In 1981, Sprague started Portland Yacht Services, a boat building, service, and storage business. In 1988, the State gave Sprague a permit to construct a floating wharf system and install a crane. Sprague repaired the old wharf head, and installed a crane on it. Sprague also connected the wharf system to the wharf head.

In 1988, CNR filed an action for trespass and nuisance against Sprague, alleging that the 1974 deed from UIS to the State had extinguished the Portland Co.'s historical crossing rights, thus eliminating all ocean access for the Sprague property. The action was referred to a referee. The parties stipulated to a record and reserved the right to object to the report. In his final report, the referee concluded that UIS had abandoned the easement across CNR's property, that CNR owned the twenty-six foot-wide strip of land along the sea wall in fee, and that all of Sprague's improvements to the wharf head constituted trespass.

Sprague filed objections to the referee's report and moved for rejection or modification of the report. After a hearing, the Superior Court adopted the referee's report. Sprague then unsuccessfully moved

for reconsideration and this appeal followed.

## I.

 The Superior Court refused to reach the merits of some of Sprague's objections to the referee's report concerning the nature of CNR's interest in the waterfront property. In those objections, Sprague argued that CNR only had a license to build its trestle bridge and never had a fee interest in the land. The Superior Court held that Sprague had failed to raise the issue of the effect of the law of submerged lands and the 1845 Act on CNR's ownership of the property before the referee and could not pursue the issue for the first time by way of an objection to the report.

Sprague contends that the issue was raised before the referee. In his report, the referee does refer to the law of submerged lands; however, it is in reference to ownership of the wharf head, not the land upland of the sea wall. Whether the land upland of the sea wall was submerged or tidal land was never determined. On the other hand, the wharf head extending from the sea wall seaward was clearly built over submerged lands and the law of submerged lands is indisputably applicable. Sprague did raise the issue of CNR's title to the waterfront property in his complaint. However, he did not pursue the argument before the referee.

The referee in this matter was asked to make findings of fact and conclusions of law. If he had been limited to finding facts, it may have been appropriate for Sprague to advance a novel legal theory for the first time before the Superior Court. However, because the referee was empowered, by agreement of the parties, to resolve legal issues in the case, Sprague was obligated to present his legal arguments to the referee. The Superior Court's role under these circumstances is to review the referee's report and determine whether it contains clearly erroneous findings of fact or errors of law. The referee cannot be said to have committed an error of law when the underlying theory was never argued before him. The Superior Court did not err by refusing to entertain those arguments that Sprague failed to make before the referee.

## II.

 Sprague argues that the State should be joined as a party under M.R.Civ.P. 19(a)(2)(ii). Sprague claims that the State claims an interest in the property and that Sprague might have to defend itself against the State in a later action if the State is not joined.

The State does not claim any interest in the property other than whatever rights UIS conveyed to it in 1974. The State has leased those rights to Sprague, and is arguably under the belief that they still exist. If the State were ever going to assert its property rights arising from the 1974 quitclaim deed from UIS, it would be doing so against CNR and not Sprague. Those rights were limited to the right to cross CNR property and use the wharf and docking area. The State need not be joined as a party.

## III.

 Sprague makes another argument for the first time on appeal and that is that we should consider the possible implications of the public trust doctrine. The relevance of the public trust doctrine to this case is dependent on a determination that all the lands owned by CNR are filled submerged lands. Because this issue was not pursued before the referee no finding was made with respect to the location of the low water mark at the time the land was filled. The record simply does not support Sprague's assertion that the 1902 CNR map conclusively establishes the location of the low water line. On the contrary, the weight of the evidence supports the CNR's contention that the filled lands were primarily tidal and above the low water line. Furthermore, Maine quitclaimed all rights arising out of the public trust doctrine to the owners of filled submerged lands, filled prior to 1975, and the Justices of this Court opined that the transfer of those rights

was constitutional. *Opinion of the Justices*, 437 A.2d 597 (Me.1981).

## IV.

The referee found that UIS had abandoned the easement created·by the agreements between the Portland Co. and the A. & St.L. and Grand Trunk railroad companies. Two recent Maine cases have established conflicting tests for determining whether a party has abandoned an easement acquired by grant. In *Chase v. Eastman*, 563 A.2d 1099 (Me.1989), we held that abandonment of an easement could be proved by showing nonuse coupled with decisive acts by the easement's owner evincing an intent to abandon. In *Witt v. McKenna*, 600 A.2d 105 (Me.1991), there is dictum that implies that a party attempting to prove abandonment must show intent to abandon and an act by the owner of the servient estate adverse to the easement owner's interest. *Id.* at 106.

Both of these cases relied on the holding in *Adams v. Hodgkins*, 109 Me. 361, 84 A. 530 (1912), and some of the confusion can be traced to inconsistencies in the *Adams* opinion. In *Adams*, it was held that an easement acquired by grant can be lost by nonuse coupled with an intention of abandonment. *Adams*, 109 Me. at 365–66, 84 A. 530. *Adams* also holds that an easement acquired by grant can be lost by adverse possession alone. *Id.* at 366, 84 A. 530. There is also dictum in *Adams* indicating that an easement created by grant can be lost only by nonuse coupled with an intent to abandon and adverse possession by the servient estate. *Id.*

■ In *Chase*, nonuse plus the intent to abandon (proved by a decisive act by the easement owner indicating an intent to abandon, e.g., failure to object to an adverse act on the part of the servient estate) was held to be sufficient to show abandonment. *Chase*, 563 A.2d at 1102–03. We reject the dictum in *Witt* implying that a party must always show an adverse act by the servient estate in order to prove abandonment. To prove abandonment a party must show 1) a history of nonuse coupled with an act or omission evincing a clear intent to abandon, or 2) adverse possession by the servient estate.

■ The referee found that CNR had proved nonuse and intent to abandon. *Id.* Nonuse for forty years was stipulated to by the parties. In order to prove intent to abandon, CNR had to show "unequivocal acts inconsistent with the further assertion of rights associated with the existence of the easement." *Id.* (citing 25 Am.Jur.2d *Easements and Licenses* § 103, at 507–08 (1966)). "The acts asserted as evidence of abandonment must be decisive and conclusive and thereby indicate a clear intent to abandon the easement." *Id.*

In 1974, Sprague's predecessor in title, UIS, quitclaimed all its rights, title and interest in a twenty-six foot-wide strip of land in front of its property and abutting the sea wall to the State. UIS could not access the harbor without crossing this strip of land, that was and still is owned by CNR. Sprague advances three reasons why the deed to the State is not proof of an intent to abandon.

First Sprague argues that the UIS did not intend to abandon the easement, but to share it with the State. Sprague points to no language in the deed to support this argument, and indeed cannot because there is none. The deed evinces no intent by UIS to retain any interest in the property. Second, Sprague argues that the State would never have wanted to eliminate the easement, because that is all that was being transferred. What the State intended or believed is irrelevant; what matters is what UIS intended. Third, Sprague contends that the deed is a legal nullity. Whether the deed is legally effective is not the issue. The issue is whether the delivery of the deed constituted an act inconsistent with the further assertion of UIS's rights associated with its easement across CNR's property. What is determinative is the fact that UIS intended to transfer the rights, not whether the deed evincing that intent is legally effective.

Sprague's predecessors in interest abandoned the last twenty-six feet of the easement across CNR's property in 1974. That

left UIS with the right to cross the first sixty feet of CNR's property, between eighty and ninety feet wide in front of the wharf head. The easement's purpose, ocean access, ceased to exist, thereby extinguishing the easement itself. H. Tiffany, *The Law of Real Property*, Vol. 3 at 817 (1939 & 1988 Supp.). Sprague argues that when the State leased its rights back to Sprague the easement was revived. Once terminated, easement rights cannot be revived. *Id.* at 825. The referee's conclusion that UIS abandoned its easement across CNR's property finds adequate support in the record.

### V.

 Finally, Sprague contends that his right to access the ocean is grounded in common law and guaranteed by the 1845 Act and therefore not affected by the doctrines of extinguishment or abandonment. This right is allegedly a natural right. Sprague overlooks the fact that any common law right of access that might be recognized would be in the riparian owner. Sprague's predecessors in title transferred their waterfront property to the A. & St. L.R.R. and Grand Trunk railroad companies in exchange for the easement and other land. Sprague is not a riparian owner. Both the 1850 and 1865 agreements provide that Portland Co. relinquished all rights and claims to the property transferred with the exception of those created by the deeds.

The entry is:

Judgment affirmed.

All concurring.