GREAT COVE BOAT CLUB

v.

BUREAU OF PUBLIC LANDS.

Supreme Judicial Court of Maine.

Argued Oct. 30, 1995.
Decided Feb. 21, 1996.

David P. Silk (orally), Curtis, Thaxter, Stevens, Broder & Micoleau, Portland, for Plaintiff.

Andrew Ketterer, Attorney General, Paul Stern (orally), Assistant Attorney General, for Defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, and RUDMAN, JJ.

RUDMAN, Justice.

■ The Bureau of Public Lands (the Bureau) appeals from a summary judgment entered in the Superior Court (York County, *Fritzsche, J.*) granting its motion for a summary judgment in a quiet title action brought by the Great Cove Boat Club (Great Cove).[1] The Bureau contends that the Superior Court erred in finding that the statutorily created constructive easement on submerged lands has not been extinguished by Great Cove's predecessor-in-interest's entry into a thirty-year lease with the Bureau for the same lands. On cross-appeal from the denial of its motion for a summary judgment Great Cove contends that while the Superior Court correctly found that the easement continued to exist, it erroneously held that the interest in the easement had not been transferred to Great Cove. We modify the judgment and affirm.

This case arises from a dispute over the rental payments owed by Great Cove for the use of submerged land owned by the State and managed by the Bureau. In 1947 Harris Spinney conveyed the parcel of land now owned by Great Cove to Gerald and Frances Berounsky. From approximately 1955 until April 1987 the Berounsky family operated Jerry's Marina, consisting of moorings and docks, in the Piscataqua River adjacent to the family's upland property. While the Berounskys still owned the docks and the upland property, the Legislature enacted a bill creating the Bureau of Public Lands. P.L.1975 c. 339 *codified at* 12 M.R.S.A. §§ 551–560 (1994).

Included within the Bureau's responsibilities is management of Maine's submerged lands. 12 M.R.S.A. § 552 (1995). The statute allows the Bureau, through its director, to lease or grant easements on the submerged land. In particular 12 M.R.S.A. § 558–A(6) (1995) provides:

> **6. Constructive Easements.** The owners of all structures actually upon submerged and intertidal lands on October 1, 1975, shall be deemed to have been granted a constructive easement for a term of 30 years on the submerged land directly underlying the structure.

*Maine, Inc.,* 429 A.2d 197, 201 (Me.1981) (citations omitted). The Superior Court's adverse finding concerning the statutory constructive easement's continued existence was essential to its judgement and therefore would bind the Bureau in future litigation. The Bureau thus was aggrieved by the Superior Court's judgment and may prosecute this appeal.

---

1. While the Bureau was nominally the prevailing party in the Superior Court, we have held that a prevailing party may prosecute an appeal from an ostensibly favorable judgment when "an essential finding on which the judgment is based might otherwise prejudice [the party] through the use of collateral estoppel in the future proceeding." *Sevigny v. Home Builders Ass'n of*

Pursuant to this provision's predecessor [2] the owners of Jerry's Marina, as owners on October 1, 1975, of structures located on submerged land, were granted a constructive easement to those submerged lands.

By deed dated April 14, 1987, the owners of Jerry's Marina conveyed their real property to Atlantic Harbors, Inc. (AHI), along with "all piers, wharfs, floats and moorings on [the] adjacent submerged lands." On April 17, 1987, AHI entered into a thirty-year lease with the Bureau of the submerged land formerly used by Jerry's Marina and covered by the statutorily created constructive easement. The leased premises included an additional area to allow for expansion of the marina. Following the signing of the lease, AHI conveyed its interest in the upland and intertidal lands to the Portsmouth Harbor Association, which is now known as the Great Cove Boat Club.

Great Cove paid the Bureau the rent specified in the lease until 1990. When, in accordance with the lease, the Bureau increased Great Cove's rent substantially, Great Cove refused to pay and, for the first time, contended it was not required to pay rent because of the existence of the statutorily created constructive easement on the land formerly used by Jerry's Marina. The parties' efforts to resolve the rent dispute failed. The Bureau declared a default pursuant to the lease, terminated it, and served notice on Great Cove to quit. Great Cove commenced an action to establish its easement rights over the submerged land.

After completion of discovery, both parties moved for a summary judgment. The court held that the Berounskys had transferred their interest in the statutorily created constructive easement to AHI and, because the lease contained no express release of the constructive easement, that AHI's entry into the lease did not extinguish the easement. The court found, however, that while the constructive easement had not been extinguished, AHI had not transferred the easement to Great Cove. The court therefore granted the Bureau's motion for a summary judgment. The Bureau's appeal and Great Cove's cross-appeal followed.

## I.

### *Mootness*

■ Great Cove, in a separate motion, contends that a recent legislative enactment entitled "An Act to Clarify the Municipal Bounds of the Town of Eliot" [3] renders the Bureau's appeal moot because it transfers the disputed submerged lands from the State to the Town of Eliot and therefore the Bureau no longer has the necessary interest in the litigation. We disagree.

■ The same rules of construction that apply to other legislative enactments apply to

2. 12 M.R.S.A. § 558 (1981, *repealed by* P.L.1983, ch. 819 § A, 9 (effective July 1, 1984) provided in pertinent part:

> **3. Constructive easements.....** The owners of all structures actually upon submerged and intertidal lands on the effective date of this act shall be deemed to have been granted such an easement.

3. Chapter 33 Private and Special Laws (1995 Session), entitled "An Act to Clarify the Municipal Bounds of the Town of Eliot," provides

> **Sec. 1. Mass.Laws of 1810, c. 74 § 1** is amended to read:
> **Sec. 1. Kittery divided.** Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, That all that part of the town of Kittery in the county of York, included within the limits of the *jurisdiction formerly known as the* second parish in the said town, *the second parish being further described as including all of the lands, submerged lands and waters within the bounds as follows: starting at the decision line beginning at the north of the Great Cove below the point of land heretofore and presently known as Thomas Spinney's Point or Spinney's, running northerly and westerly up through the middle of the Great Cove to the head of the cove as lies due southwest of the bridge formerly know as Gowell's Bridge, then continuing northeasterly along the bounds of the Town of Kittery to the bounds of the Town of York, thence and continuing west and northerly to the southern bounds of the Town of South Berwick, then continuing southerly and easterly down the middle of the Piscataqua River and then to the point of the beginning, the bounds including and comprising all of the lands, submerged lands and waters contained therein,* be and hereby is incorporated into a separate town, by the name of Eliot, with all the powers, privileges, and immunities, with which other towns are invested by the constitution and laws of this commonwealth *and the State of Maine.* P. & S.L.1995, ch. 33.

public grants and resolves of incorporation. Sutherland, Statutory Construction § 63.01 (5th Ed.1992). Thus, "[i]f the meaning of a statute is clear and the result achieved by that meaning is not illogical or absurd, there is no reason to look beyond its words." *Phelps v. President and Trustees of Colby College*, 595 A.2d 403, 405 (Me.1991) (citations omitted). Furthermore, we strictly construe such grants against the grantee and in favor of the State and limit the effect of the statute to its terms. *See State v. Central Maine Power Co.*, 640 A.2d 1067, 1071 (Me. 1994). While we have recognized the Legislature's ability to grant title to submerged lands, we have required that the legislative grant must contain "words of grant, release, or confirmation or clearly expressed intent to make a conveyance of title at that time." *Boothbay Harbor Condominiums v. Department of Transp.*, 382 A.2d 848, 855 (Me. 1978).

The recent enactment clarifying Eliot's town boundaries is devoid of any operative words of grant. *See* 3 Tiffiny, *The Law of Real Property* § 971 (1939) (discussing and giving examples of operative words signifying a present intent to pass an interest in land). Rather, as indicated by the Act's title, it merely clarifies Eliot's municipal bounds and places within Eliot's municipal jurisdiction the submerged lands in dispute. The legislative enactment did not transfer title of the disputed submerged lands to Eliot and does not render the present appeal moot.

## II.

### Release of the Statutorily Created Constructive Easement

The Bureau contends that the court erred in holding that because the lease entered into by the State and AHI did not explicitly terminate the statutorily created constructive easement it did not operate to extinguish the easement. We agree with the Bureau that AHI through its actions released the easement and the easement thereby was extinguished.

At the outset we note, without expressing any opinion on the correctness of this concession, that the Bureau concedes that section 588–A creates an easement appurtenant. We accept this concession for purposes of deciding this appeal. An easement appurtenant is a non-possessory interest in the owner of one parcel of land, by reason of such ownership, to use the land of another for a specific purpose. *Davis v. Briggs*, 117 Me. 536, 538, 105 A. 128 (1918). An easement appurtenant can be terminated in five ways: (1) by expiration; (2) by an act of the dominant owner (either by release or abandonment); (3) by act of the servient owner (prescription or conveyance to a bona fide purchaser without notice); (4) by conduct of both of the parties (merger or estoppel) or, (5) by eminent domain, mortgage, foreclosure or tax sale. 3 Powell, *The Law of Real Property* ¶ 421–426 (1992). In this case we focus our attention on the second of these five: release or abandonment by the owner of the dominant tenement.

The owner of the easement may end the easement by releasing it to the owner of the servient estate. 3 Powell, *The Law of Real Property* ¶ 423 (1992). "The effectiveness of a release, like that of an abandonment, depends on a finding of intention." *Jackvony v. Poncelet*, 584 A.2d 1112, 1114 (R.I.1991) (citing *Restatement of Property* § 504 cmt. b (1944)). With respect to abandonment, we have stated that the requisite intent to abandon an easement may be demonstrated by unequivocal acts which are decisive and conclusive and indicate a clear intent to extinguish the easement. *See, e.g., Phillips v. Gregg*, 628 A.2d 151, 153 (Me.1993) (quoting *Canadian Nat. Ry. v. Sprague*, 609 A.2d 1175, 1179 (Me.1992)); *Restatement of Property* § 504 cmt. e (1944) ("An intention to abandon an easement may be inferred ... from affirmative acts inconsistent with the intention to make a future use.") Because a release operates to increase the alienability of land by decreasing the number of persons who can claim an interest in the land, less formality is required to release an easement than to create one. *Restatement of Property* § 503 cmt. a (1944); Powell, *The Law of Real Property* ¶ 423 (1992).

AHI entered into a thirty-year lease of the submerged lands adjacent to its upland property. While the lease did not expressly men-

tion the statutorily created constructive easement now claimed by Great Cove, the terms of the lease were inconsistent with the continued existence of the constructive easement. The term of the lease extended beyond the termination of the constructive easement, included a larger geographic area than that of the constructive easement, contractually bound AHI to pay rent to the State for the use and enjoyment of an area it previously had enjoyed the use of rent-free pursuant to its statutorily created constructive easement, and permitted the Bureau on default to take possession of the submerged land and the chattels attached to the submerged land. By entering into a lease that contained terms and conditions that were inimical to the property interest it enjoyed pursuant to its statutorily created constructive easement, AHI clearly and unequivocally manifested an intention to release the constructive easement. Thus, the trial court erred in its determination that entry into the thirty-year lease by AHI did not extinguish the statutorily created constructive easement assigned to AHI.

Because the constructive easement was extinguished by AHI's entry into the long-term lease with the Bureau, we need not consider Great Cove's contention on cross-appeal that subsequent to the execution of the lease by AHI the easement was transferred by AHI to Great Cove.

### III.

#### Common Law Riparian Rights

Great Cove contends in its cross-appeal that the court erred in finding that a riparian property owner had no absolute right to maintain wharves or docks beyond the low water mark.

At common law, the owners of land abutting a body of water, by reason of their adjacency, were accorded certain rights or privileges different from those generally belonging to the public. According to an early twentieth century authority, the traditional common law rights included: (1) the right to have the water remain in place and retain, as nearly as possible, its natural character, (2) the right of access to the water, (3) subject to reasonable restrictions, the right to wharf out to the navigable portion of the body of water, and (4) the right of free use of the water immediately adjoining the property for the transaction of business associated with wharves. Farnham, *Water and Water Rights* § 62 (1904) *quoted in* Kalo, *Coastal and Ocean Law* 119–20 (1991). We have recognized, however, that while a riparian land owner has certain rights which inhere in his ownership of land adjacent to a body of water, these rights are subject to reasonable regulation by the State in the exercise of its public trust rights. *Whitmore v. Brown,* 102 Me. 47, 56, 65 A. 516 (1906) (citing *Commonwealth v. Alger,* 61 Mass. (7 Cush.) 53 (1851)). In *Whitmore,* while acknowledging an upland owner's right to erect wharves, we also recognized the Legislature's power to regulate such construction by requiring the upland owner to acquire a license before building the dock. *Id.* As one court has stated in addressing the conflict between an upland owner's traditional common law rights and the State's interests under the public trust doctrine,

> [A] littoral proprietor and riparian owner, as is universally conceded, have [sic] a qualified property in the waterfrontage, belonging by nature to their land; the chief advantage growing out of the appurtenant estate in the submerged land being the right of access over an extension of their water fronts to navigable water, and the right to construct wharves, piers or landings subject to such general rules and regulations as the legislature, in the exercise of its powers, may prescribe for the protection of public rights in rivers or navigable waters.

*Capune v. Robbins,* 273 N.C. 581, 160 S.E.2d 881, 886 (1968). Thus, Great Cove's riparian rights, which include the right to wharf-out, are not absolute, but rather are subject to the reasonable regulation contained in section 558–A requiring the obtaining of a lease or easement from the Bureau in order to erect a wharf or dock. The court did not err on this point in granting the Bureau's motion for a summary judgment.

The entry is:

Judgment modified to extinguish the statutorily created constructive easement and, as so modified, affirmed.

WATHEN, C.J., and ROBERTS and GLASSMAN, JJ. concurring.

CLIFFORD, Justice, dissenting.

Because, in my view, the Superior Court correctly determined that AHI's rights in the statutorily created easement were not extinguished by virtue of AHI's lease with the Bureau of Public Lands, I respectfully dissent.

AHI's property interest in the easement is separate and distinct from the leasehold interest. The fact that the lease covered the same property that was subject to the statutory easement does not extinguish the easement. "[A]n easement is not divested by the acts of the owner of the easement in seeking and obtaining permission or license from the owner of the servient estate to make the same use of the latter's premises as could be made under the existing servitude." 25 Am. Jur.2d *Easements & Licenses* § 109 (1966). An intent on the part of the owner to release an interest such as the statutory easement cannot lightly be inferred. Before such a release can operate to terminate such a property interest, the intent to do so must be clearly expressed. *Adams v. Hodgkins,* 109 Me. 361, 366–67, 84 A. 530 (1912).

The lease AHI signed with the Bureau concerns an area greater than that covered by the statutory easement and is for a longer period of time. The lease contains no language expressly releasing AHI's interest in the statutory easement, nor does it contain any other provisions from which such a release may be inferred. Moreover, as noted by the trial court, there is language in the statute creating the lease that suggests a possibility of the simultaneous existence of both a lease and the statutory easement. 12 M.R.S.A. § 558–A(2)(A)(1)(e).

I would affirm the judgment of the Superior Court without modification.