STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-05-41
GAB- YOR-9/4/2007

ROBERT W. BRITTON, et al.,

Plaintiffs

v.

ORDER

DONALD L. GARBRECH
AW LIBRARY

JAN 15 2008

MAINE DEPARTMENT OF
CONSERVATION, et al.,

Defendants

This matter comes before the Court on Defendants' Motion for Summary Judgment pursuant to M.R. Civ. P. 56. Following hearing, the Motion is Denied.

## FACTUAL BACKGROUND

Plaintiffs Robert and Eleanor Britton ("the Brittons") own property on the York River in York Harbor, Maine. Defendant Daniel P. Donnell ("Donnell") owns property which abuts the southeastern portion of the Brittons' property, and Defendant Donnell Realty Trust ("DRT") owns property which abuts the northwestern portion of the Brittons' property. Mary Donnell Coite, Daniel P, Donnell, II and Michael Donnell are also defendants in their capacity as trustees of the DRT. Donnell operates a commercial wharf called Simpsons Wharf, and the DRT operates a wharf called Varrell Wharf, which is a public marina. Both wharves extend below the low-water mark. All of the parties own the tidal flats in front of their properties according to their deeds, but they dispute where the boundary line lies across the tidal flats between the Britton and Donnell properties. This is relevant to whether Simpsons Wharf encroaches on the

Brittons' property. But, because the Brittons concede that Donnell's deed affords him the right to dock boats off of Simpsons Wharf, they do not challenge those floats.

Instead, the primary issue in this case is whether the Varrell Wharf floats improperly occupy the area in front of the Brittons' property and in which the Brittons claim unobstructed riparian rights. The Brittons contend that the Varrell Wharf floats occupy 48 feet of the 90-98 foot width of their riparian area, severely restricting access to the water between the wharves.

The Brittons have owned their property since 1975; the Varrell Wharf has been in its present position since approximately 1955. Also, some floats apparently were installed in the 1950s. The Brittons' predecessor in title did not object to the floats, and when the Brittons moved in, they initially had an arrangement with the Donnells which allowed them to dock two boats at Varrell Wharf. That arrangement ended in approximately 1984. The Brittons then began planning to add a pier of their own and they objected to the location of the Varrell Wharf floats in front of their property. The Brittons have challenged the floats ever since, including opposing a permit that the Army Corps of Engineers granted to Donnell in the early 1980s.[1]

In 2003, Donnell and the DRT sought leases from the State for the submerged land where the Varrell and Simpson wharves are located. They did so because their constructive easement[2], which they had over the submerged lands for thirty years pursuant to a Maine statute, was due to expire in 2005. The Brittons objected to the

---

[1] The Army Corps also granted the Brittons a permit in 1990, and it ordered removal of 20 feet of Varrell floats to allow the installation of a pier on the Britton property. The Donnells challenged this in the federal district court, which rejected their request for equitable relief. *Donnell v. U.S.*, 834 F. Supp. 19, 27 (D. Me. 1993). After the lawsuit, however, the Army Corps decided not to require the Donnells to remove any floats.

[2] This was not a prescriptive easement. The Donnell easement was a statutory creation, to exist for only a limited time.

leases before the Bureau of Lands ("the Bureau"), but the Bureau granted the leases over their objection in 2005. The Brittons brought this action in July 2005, part of which was an 80C appeal. This Court determined that the 80C appeal of the Bureau's actions was untimely and dismissed that portion of the lawsuit, leaving claims against Donnell and the DRT for declaratory and injunctive relief, a statutory nuisance claim, and a claim under the Wharves and Weirs Act. Donnell and the DRT contend that the litigation is a veiled collateral attack on the Bureau's decision to issue the leases. The Brittons argue that they do not collaterally challenge the leases, rather they contest the alleged use of those leases to violate their property rights. They seek removal of the floats that interfere with their access to their entire water frontage, along with damages for nuisance. Donnell and the DRT now move for summary judgment, and the Brittons contend that they are also entitled to summary judgment.

## DISCUSSION

1.    Summary Judgment Standard.

Summary judgment is proper where there exist no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 22. At this stage, the facts are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63, 65.

3

2.      Statutory Nuisance Claim.

A civil lawsuit may be brought when a landowner experiences an injury to his or her "comfort, property, or the enjoyment of his [or her] estate by a common and public or private nuisance." 17 M.R.S.A. § 2701 (2005). The Brittons contend that the alleged encroachment of the floats into their riparian area constitutes a nuisance because it interferes with their property rights, especially the right to unobstructed water access from their property.

a.      Riparian Rights and the Public Trust Doctrine.

A major issue in this case is whether the Court should apply the public trust doctrine, which is an integral part of a common law riparian rights analysis. Common law riparian rights include water access, installation of wharves "subject to reasonable restrictions," and unfettered use of water adjacent to the land "for the transaction of business associated with wharves." *Great Cove Boat Club v. Bureau of Public Lands*, 672 A.2d 91, 95 (Me. 1996). Riparian rights are not absolute; they are "subject to reasonable regulation by the State in the exercise of its public trust rights." *Id.* In *Great Cove*, the Law Court held that the State could reasonably regulate the plaintiff's wharfing rights by requiring it to acquire a "lease or easement" to install a wharf or dock. *Id.*

Unlike *Great Cove*, however, this case does not involve a claim that property owners have absolute rights to maintain wharves regardless of the state's interest. Here, the parties do not dispute that riparian owners' rights are subject to reasonable regulation by the United States Government and the State of Maine acting in the public interest. The Brittons, however, contend that the public trust doctrine does not control the outcome of this case because it does not involve the taking of private land or interference with private owners' property rights in favor of the public. Instead, they

4

contend that Maine property law applies because this case involves a dispute between private landowners. They claim that their riparian rights are suffering, not as a result of the leases or the state's general regulatory power, but due to Donnell's and the DRT's use of the riparian area to facilitate his commercial enterprise.

What is at issue in this case is the manner in which the Donnells and the DRT have used the leases granted to them by the Bureau. Although those leases are beyond attack, the existence of a lease does not give a lessee the right to unreasonably interfere with the property rights of abutters. The public trust doctrine does not govern this landowner dispute, as neither side questions the ability of the government to regulate waterfront usage. Instead, the Court's analysis will focus on whether Donnell's and the DRT's private and commercial use of the leased area interferes with the Brittons' riparian rights.

### b. Extent of Riparian Rights.

Having determined that the common law of riparian rights governs this matter, the focus becomes the extent of those rights and the manner in which courts have addressed purported interference with those rights. Maine law presumes that "the owner of the sea frontage has, in virtue of his ownership, the right of ocean access for the whole width of the frontage." *Robinson v. Higgins Co.*, 126 Me. 55, 58, 135 A. 901, 902 (1927). In *Robinson*, the defendant lobster company had received a license to extend the end of its wharf "from the municipal officers." 126 Me. at 57, 135 A. at 902. Nevertheless, Law Court upheld an injunction prohibiting the company from extending its wharf because the expansion in front of the plaintiffs' Boothbay Harbor property would "unduly trench upon" their rights. 126 Me. at 59, 135 A. at 903.

This principle has also been applied in cases involving other bodies of water. For example, this Court addressed a claim regarding interference with plaintiffs' riparian

rights due to activity at the Town of Freeport's wharf on the Harraseeket River. *Coffin v. Town of Freeport*, CUMSC-CV-1986-1141 (Me. Super. Ct., Cum. Cty., Mar. 29, 1989) (Lipez, J.). In *Coffin*, moorings off of the south side of the Town's wharf prevented the plaintiffs, adjacent landowners, from making full use of their own wharf. *Id*. The Court held that the situation warranted injunctive relief for the plaintiffs because that portion of the float system interfered with their riparian rights. *Id*.

In another case, the Law Court noted that even if a landowner receives a license to build a wharf, "the license will not protect the wharf from complaints for infringement of private rights." *Whitmore v. Brown*, 102 Me. 47, 56, 65 A. 516, 520 (1906). There, the Law Court refused to grant injunctive relief to prevent a defendant from expanding his wharf off of Mt. Desert Island, despite an abutter's claim that it infringed on her property rights. 102 Me. at 62, 65 A. at 522. Although the abutter was not entitled to equitable relief, the Court stated that she may be able to establish a right to legal relief for possible "infringement of her individual legal rights" in a separate action at law. *Id*.

Whether a wharf did actually obstruct or impede navigation and thereby become a nuisance at common law . . . [is] a question of fact." *Whitmore*, 102 Me. at 56, 65 A. at 530. As the plaintiffs in *Coffin* and *Robinson* were entitled to seek redress from the courts when they alleged that their neighbors interfered with their use and enjoyment of their riparian rights, the Brittons also are entitled to seek such a determination. Their statutory nuisance claim rests on whether the unfettered use and enjoyment of the York River inherent in their riparian rights is impaired by the placement of the floats and other objects connected with the wharves. This presents a genuine issue of material fact, and the Donnells' summary judgment motion is Denied as to this issue.

6

3.    Wharves and Weirs Act.

Maine law provides that "[n]o fish weir, trap or wharf shall be erected or maintained in tidewaters below [the] low-water mark in front of the shore or flats of another without the owner's consent." 38 M.R.S.A. § 1026 (2005). The remedy for a violation of this provision is a civil action to recover a $50 penalty per offense. *Id.*

Donnell and the DRT contend that the statute of limitations bars this claim. They assert that Varrell Wharf has been in its current location since at least 1955, and Simpsons Wharf has been in its current location since at least 1962. The Brittons have resided on their York River property since 1975, and they filed this civil action in July 2005. The statute of limitations for the cause of action permitted under the Wharves and Weirs Act, nuisance or trespass, is six years "after the cause of action accrues." 14 M.R.S.A. § 752. The Wharves and Weirs Act prohibits installation *and* maintenance of wharves in front of another person's property without that person's consent; therefore, under its explicit language, a cause of action can accrue as a result of erecting *or* maintaining a wharf. The statute of limitations does not begin to run solely from installation of a wharf.

The Brittons' complaint alleges that, following the Bureau's grant of leases for submerged lands in 2005, they have not consented to the manner in which Donnell and the DRT have used the leased area, which allegedly has impacted them. Any claims flowing from the use of the leased area and involving interference with the Brittons' riparian rights are not time-barred.[3] As Donnell and the DRT advance no other legal argument in support of summary judgment on this claim, and a genuine issue of

_____

[3]    To the extent that this lawsuit seeks to collaterally challenge the permit(s) and decision(s) of the Army Corps of Engineers in the 1980s and 1990s, however, those claims would be time-barred.

7

material fact remains as to the nature and scope of any permission or implied consent[4], the motion is Denied on this issue.

4.    Declaratory Judgment Claim.

This Court has the authority to issue declaratory judgments concerning legal rights. 14 M.R.S. § 5953 (2005). Seeking a declaratory judgment is a long-recognized method by which a person can obtain "a binding judicial determination of [his or her] legal rights" in property. *Colquhoun v. Webber*, 684 A.2d 405, 411 (Me. 1996) (citations omitted).

The issue of the validity of the leases issued by the Department of Conservation has already been determined adversely to the Brittons, who now argue that the manner in which the leased area is being used violates their property rights. Donnell and the DRT argue that this count essentially presents a collateral attack on the legality of the leases. They further argue that the Bureau already determined that the Varrell and Simpsons Wharves did not violate the Brittons' rights because there is a safe, navigable passage between the wharves, allowing the Brittons access to the York River. Additionally, they note that the Donnell and DRT leases provide for a reduction in the leased area should the Brittons receive approval to construct a wharf, which also would protect their rights.

In support of these contentions, the Donnells cite a case in which the Law Court held that a litigant's claim was properly dismissed as a collateral attack, upon a final judgment. *Cline v. Maine Coast Nordic*, 1999 ME 72, ¶ 14, 728 A.2d 686, 689. There, the plaintiff had a license for a fishing weir that he had not maintained for a number of

---

[4]    The Brittons purchased their property in 1975, but no dispute about the wharves seems to have arisen until 1984, when the Brittons could no longer use them. There is also some debate about whether consent of the prior owner can be inferred. Finally, Donnell and the DRT suggest that if the motion is denied, they will raise the issues of adverse possession and/or prescription, which they have not yet addressed due to the predominantly factual nature of the inquiry.

8

years. Nevertheless, he objected to his neighbors' aquaculture lease. *Id.* ¶ 3, 728 A.2d at 687. The Court held that, although the license issue was not the focus of the decision concerning the aquaculture lease, "the granting of the lease had a direct impact on whether the weir could be used." *Id.* ¶ 12, 728 A.2d at 689. Because the lease decision was final, and it involved consideration of the conflicting license, it could not be challenged in a separate civil action. *Id.*

*Cline* is distinguishable from the present case. There, the Court focused on a conflicting license and lease, both regulatory grants and both of which necessarily were considered before the administrative body. Here, the Brittons take issue with the manner in which the leases are being used. Viewing the facts in the light most favorable to them, the Bureau's determination that an appropriate navigable distance exists between the wharves is distinct from the issue of whether the use of the wharf constitutes a nuisance. Additionally, the Bureau's decision did not have a regulatory effect on the Brittons. It merely considered the impact on them as a factor in determining whether to grant the Donnell and DRT leases, and that decision does not govern any subsequent concerns regarding the manner of use of the leased property.

Clearly, the validity of the leases may not be challenged, as this Court dismissed the administrative appeal with prejudice. However, holding a valid lease does not permit Donnell or the DRT to conduct permitted activity in a manner that otherwise violates the Brittons' rights. Whether a declaratory judgment should issue for either party depends on whether the operation of the floats in the Brittons' riparian area violates their property rights, which turns on the factual issues. At trial, the Court must also consider whether the Donnell and DRT leases would be useless without the ability to operate the floats. Both the Brittons' riparian rights and Donnell and the DRT's

9

rights under the lease must be considered, and the parties dispute where the boundary line across the tidal flats lies. Accordingly, summary judgment is Denied on this count.

5.    Applicability of the Colonial Method.

Lastly, there is some dispute about whether the Colonial Method should be used to determine the intertidal boundary between the Donnell and Britton properties. Because this is more relevant to issues regarding Simpsons Wharf than Varrell Wharf, it may not be necessary to address this potential boundary dispute. Should the Court reach this issue, a brief analysis of the Colonial Method follows.

The Colonial Method enables a property owner to determine the sideline boundary of lots adjacent to water when the deed does not provide a clear boundary. *See Emerson v. Taylor*, 9 Me. 42, 43 (1832). This method is derived from the Colonial Ordinance of 1641, which has become a part of Maine common law, and provides that the property interest of an owner whose land borders on water extends to the low-water mark unless a different designation appears in the deed. *Id.* In *Emerson*, the Law Court explained how the boundary lines are to be drawn when there is a dispute. *Id.* at 44-45.[5]

Here, the Donnells contend that it is the Brittons' burden to establish the location of the intertidal zone, and they have not done so. The Brittons have provided a survey establishing the boundary lines. But, the Donnells argue that a new survey should be performed using the Colonial Method because, in order to get an accurate measure of the frontage to which an owner is entitled, one must measure the sidelines of the lots as they originally existed.

---

[5]    For a detailed explanation of the Colonial Method, see *Ogunquit Beach Dist. v. Perkins*, 138 Me. 54, 62-63, 21 A.2d 660, 665 (1941).

In this case, however, a new survey using the Colonial Method is not required in light of the existing survey. *See Call v. Carroll*, 40 Me. 31, 34 (1855) (holding that the Colonial Method applies "when the lots are all run out at the same time;" otherwise, it is not a mandatory exercise, but a "satisfactory rule for dividing the flats at the point of division"). The Brittons' survey contains sufficient description for the lines to be determined without using the Colonial Method.

## CONCLUSION

Summary judgment is Denied for either party.


Dated:         September 4 , 2007

G. Arthur Brennan
Justice, Superior Court


Gerald F. Petruccelli, Esq. - PL
Bruce A. McGlauflin, Esq. -   PL
Mark Furey, Esq. - DEFS (DONNELL)

11