STATE OF MAINE                                    SUPERIOR COURT
                                                   CIVIL ACTION
YORK, ss.                                          DOCKET NO. AP-05-041

                                                   CAS-YOR- 1/11/c10

ROBERT BRITTON, et al,

              Appellant           JAN 20 2006

     v.                                      ORDER

MAINE DEPT. OF CONSERVATION

              Appellee


     This case comes before the Court on the Maine Department of Conservation's

Motion to Dismiss Robert and Eleanor Britton's 80C appeal, Appellant's Motion to

Determine Future Course of Proceedings, and Appellant's Motion for Enlargement of

Time to File 80C appeal. Following hearing, the Motion to Dismiss is Granted.

                          **FACTUAL BACKGROUND**

     On January 31, 2005, and March 22, 2005, the Maine Department of Conservation

(MDC) issued final findings and decisions approving two submerged land lease

applications for the Donnell Realty Trust. This administrative proceeding began on

November 19, 2003, when the Donnell Realty Trust applied for the leases in connection

with their long-existing wharfs in York Harbor. On December 19, 2003, an attorney

informed the MDC that he would be representing the Brittons, abutting property

owners, with regard to the lease applications. On April 15, 2004, the attorney prepared

and submitted comments opposing the lease on behalf of the Brittons. On August 5,

2004, the attorney submitted additional information to the MDC on behalf of the

Brittons. On March 22, 2005, the MDC mailed copies of both decisions to the attorney's

office with a notice setting forth the rights of appeal to the Superior Court and the deadline for appeal pursuant to 5 M.R.S.A. § 11002(3). Although the Britton's attorney retired in December 2004, his office remained open and the decisions were received by his staff in March 2005. However, it wasn't until early June 2005 that the attorney learned about the decisions.[1] On June 16, 2005, the Brittons sent a letter, dated June 9, 2005, to the MDC asking for an extension of the appeal process because they had not yet received the decisions from their attorney. Mr. Britton did not personally receive notice of the decisions until they arrived in a letter from Dan Pritchard, supervisor of the submerged lands program at the MDC, on June 21, 2005. Mr. Britton filed an 80C appeal on July 20, 2005.

The central issue in this case is whether the appeal should be dismissed as untimely.

## DISCUSSION

The Brittons assert that they did not have actual notice of the final decisions of the MDC on and around March 2005, because, although the decisions were sent to the office of their attorney, he had retired at that time and did not forward the decisions to them. They contend that once they received notice of the decisions from Dan Pritchard of the MDC, they filed an 80C appeal within 30 days pursuant to 5 M.R.S.A. § 11002(3). In response, the State argues that the appeal is time-barred because the MDC sent copies of the decisions to counsel of record for the Brittons.

Under Maine's Administrative Procedure Act (APA), a petition for review of final agency action "shall be filed within 30 days after receipt of notice if taken by a

---

[1] According to the Affidavit of the attorney's secretary, the attorney requested that she contact him when the decisions arrived from the MDC. However, when the decisions arrived, the secretary stated that that she did not recognize them as such because the correspondence was addressed to the Donnells. However, she acknowledges that she assisted the attorney with the Britton case and knew to put the correspondence in the Britton file.

2

party to the proceeding of which review is sought." 5 M.R.S.A. § 11002(3) (emphasis added). To effectuate a proper receipt, the APA further requires that a copy of the decision be delivered or promptly mailed to each party to the proceeding or his representative of record. 5 M.R.S.A. § 9061 (emphasis added).

Unlike Rule 6(b) of the Maine Rules of Civil Procedure, which allows the court to extend the time for taking action due to a party's excusable neglect, statutory periods of appeal are not subject to a court-ordered enlargement of time. *City of Lewiston v. Maine State Employees Association*, 638 A.2d 739, 741 (Me. 1994); *Reed v. Halperin*, 393 A.2d 160, 162 (Me. 1978) (specifically holding that 5 M.R.S.A. § 11002 is not subject to enlargement of time). Rather, "specific periods of appeal statutorily affixed to the several steps in the chain of administrative review are jurisdictional and mandatory." *McKenzie v. Maine Employment Security Commission*, 453 A.2d 505, 509 (Me. 1982).

In *McKenzie*, the Law Court hinted at the possibility of applying the principles of equitable estoppel to enlarge the time of a statutory appeal deadline. 453 A.2d at 513.[2] However, the Court noted that this doctrine is limited to situations involving more than "mere hardship." *Id.*

Notwithstanding the foregoing authority, the Brittons argue that *Landmark Realty v. Leasure*, 2004 ME 85, ¶ 7, 853 A.2d 749, 750, provides this Court with the authority to set aside time requirements for appeals because they are claim-processing requirements, not "jurisdictional" requirements.

---

[2] For an equitable estoppel claim to succeed, a party must establish that (1) the statements or conduct of the governmental representative induced him to act; (2) the reliance was detrimental; and (3) his reliance was reasonable. *Tarason v. Town of S. Berwick*, 2005 ME 30, ¶ 15, 868 A.2d 230, 234 (Me. 2005). Even if the Law Court were to formally recognize this doctrine in order to grant extensions to statutory appeal periods, the Brittons did not rely to their detriment on the actions of representatives of the MDC.

3

The *Landmark* decision sheds light on the confusion surrounding "jurisdictional" issues.[3] The Court clarified that "claim-processing rules"[4] are not jurisdictional, despite past decisions using that language. *Landmark*, 2004 ME 85, ¶ 7, 853 A.2d 749, 750. Rather, claim-processing rules are the procedural mechanisms necessary to invoke jurisdiction. *Id.* at n. 1 (citing *Curacao Drydock Co. v. The M/V Akritas, 710 F.2d 204, 206-07 (5th Cir. 1983)* (stating that "requirement of a timely notice of appeal does not govern our subject matter jurisdiction . . . but is a mandatory precondition to our exercise of jurisdiction.")). It follows then that claim-processing rules do not delineate what cases Maine courts are competent to adjudicate. Only the Maine Legislature may determine the subject-matter jurisdiction of the courts of Maine. See *Landmark*, 2004 ME 85, ¶ 8, 853 A.2d at 751 (The District Court has exclusive jurisdiction over disclosure proceedings pursuant to 14 M.R.S.A. § 3121-A (2003)); See *Kontrick v. Ryan*, 157 L. Ed. 2d 867, 540 U.S. 443, 124 S. Ct. 906, 915 (2004).

Although *Landmark* has provided much needed guidance in this area, it is not applicable to this case. The Brittons have framed the issue as being equivalent to failing to file a notice of appeal pursuant to court-made claim processing rules. However, the issue before the Court does not involve only a claim-processing rule. Rather, this case involves the timeliness of an administrative appeal, a time limit set by the Legislature. 5 M.R.S.A. § 11002(3).[5]

---

[3] This jurisdictional confusion was by no means exclusive to Maine. See *Kontrick v. Ryan*, 157 L. Ed. 2d 867, 540 U.S. 443, 124 S. Ct. 906, 915 (2004).

[4] Claim processing rules, i.e., the Maine Rules of Civil Procedure, govern proceedings over which Maine courts have subject-matter jurisdiction.

[5] In *Landmark's* parent case, *Kontrick v. Ryan*, the Supreme Court explained that the time prescriptions contained in the Federal Rules of Bankruptcy Procedure 4004(a) and (b) and 9006(b)(3), were claim processing rules, to which Congress had not enacted specific time limits. *Kontrick v. Ryan*, 540 U.S. 443, 448 (2004).

4

In this case, it is clear that on March 22, 2005, the Britton's attorney was the appropriate representative to accept receipt of the final agency decisions of the MDC. See *Bergeron v. Brunswick School Department*, 2003 U.S. Dist. LEXIS 6124 (D. Me. Mar. 24, 2003) (notification of the representative who appeared on behalf of a party in an administrative proceeding is sufficient to initiate a period of limitations for further action). The MDC did not become aware of the attorney's retirement until sometime in June 2005, two months after the deadline for appeal. While this is an unfortunate situation, the Court cannot impute fault to the MDC or relieve the Britton's of their obligation to file a timely appeal.

The entry will be as follows:

The MDC's Motion to Dismiss is Granted.

The Britton's Motions to Enlarge Time and Determine Future Course of Proceedings are dismissed as moot.

Dated:     January *11*, 2006

G. Arthur Brennan
Justice, Superior Court

Gerald F. Petrucelli, Esq. - PLS
Mark Furey, Esq. - DEFS DONNELL &
                   MARY DONNELL COLTE
Margaret A. Bensinger, AAG - DEF. MAINE DEPT. OF CONSERVATION

STATE OF MAINE                                    SUPERIOR COURT
                                                     CIVIL ACTION
YORK, ss.                                    DOCKET NO.  AP-05-041


ROBERT W. BRITTON, et al.,

            Plaintiffs


        v.                                        **ORDER**


DANIEL P. DONNELL, Trustee of
the Donnell Realty Trust, et al.,

            Defendants


    In this case the Brittons seek injunctive relief and monetary damages, claiming

that the Donnells have infringed on their riparian rights and are in violation of the

Wharves and Fish Weirs Act.  38 M.R.S.A. §1026.[1]  Following trial, judgment will be

entered in favor of the Donnells.

## FACTS AND PROCEDURAL BACKGROUND

    The dispute in this case arises from Defendants Daniel P. Donnell and Trustees of

the Donnell Realty Trust's (Donnells) maintenance and use of wharfs, located on the

York River, York Harbor Maine.  Plaintiffs Robert W. Britton and Eleanor F. Britton

(Brittons) own property located at 15 Simpson's Lane, York Harbor Maine.  The Brittons

purchased the property in 1975, and occupy the property seasonally.  The breadth of the

Brittons waterfront boundary is approximately 105 feet.  The land abutting the river is

a mud flat that limits the size of boats that can be brought close to shore.

---

[1]     The complaint also contains a Rule 80C count challenging the procedure whereby the Donnells
were awarded a submerged land lease. That count has been dismissed by the court.

The Donnells own and operate two wharves extending perpendicularly just beyond the boundary of the Brittons' property. The first wharf, Varrell Wharf, lies northwesterly of the Brittons' property and has been maintained and operated in its current configuration since 1955. Varrell Wharf contains two primary sections, one running perpendicular to the Brittons' property, and a forty-eight foot section running parallel to the Brittons' York River boundary (Varrell Extension).[2] The second wharf is called Simpson's Wharf and was purchased by the Donnells in 1962 from Edward Kennedy. There is a forty-one foot gap between the Varrell Extension and Simpson's Wharf. The deed to Simpson's Wharf included the right to dock boats on the northwesterly side of the Wharf near the Brittons' property. When boats are so docked, the gap between the Varrell Extension and Simpson's Wharf is reduced.

From 1975 through the mid-1980's, the Brittons docked two boats at Varrell Wharf. The parties had a disagreement and the Brittons made other docking arrangements. They also sought permission from the Town of York to build a pier from their property. Permission was denied because the current Town of York zoning ordinance forbids the construction of a wharf at the Britton property. However, since 1987, the Brittons have objected to the presence of the forty-eight foot section of wharf running parallel to their property line. They assert that the presence of the forty-eight foot section interferes with their riparian rights of ingress and egress. They claim an absolute right of access across the entire riverfront boundary of their property.

The instant suit was commenced in 2005. At that time the Donnells entered into a Submerged Land Lease (Lease) with the State of Maine, Bureau of Parks and Lands

---

[2]     This forty-eight foot Varrell Extension was added in 1955. Edward Kennedy was then the owner of the Brittons' property and neither objected to nor expressly consented to the installation. Defendant Daniel Donnell believed that he had the absolute right to expand the wharf without permission.

(Bureau) entitling them to occupy the submerged lands under Varrell Wharf. The Lease contains a condition that, should the Brittons obtain permission to build a pier from the appropriate authorities, the location and/or docking arrangements on Varrell Wharf may be altered at the discretion of the Bureau.

An order denying summary judgment to both the Donnells and the Brittons was issued on September 4, 2007. In June 2008 a bench trial was held.

The specific issue before this Court is whether the presence of the forty-eight foot section of Varrell Wharf infringes on the Brittons' common-law riparian rights and/or is in violation of 38 M.R.S.A. §1026, the Wharves and Fish Weirs Act.[3] The Brittons seek both injunctive and declaratory relief, as well as damages under the Wharves and Fish Weirs Act and pursuant to a nuisance claim. The Donnells assert that the Brittons' riparian rights have been abandoned and/or that they have obtained the Brittons' rights by adverse possession or prescription. They also assert that the Brittons are not entitled to injunctive relief.

---

[3] The Wharves and Fish Weirs Act, initially enacted in 1876 stated in pertinent part:

> Any person intending to build and maintain any wharf or fish weir in tide waters, within the limits of any city or town in this state, may make application in writing to the municipal officers thereof, stating the location, limits and boundaries . . . . and asking for license for same. . . . If upon such examination and haring of all parties interest, said municipal officer shall decide that such erection or extension would not be an obstruction to navigation, or an injury to the rights of others,. . . they shall issue a license. . . .

R.S. ch. 78 § 1 (1876). The Act was revised in 1911 to add:

> No fish weir, trap or wharf shall be extended, erected, or maintained except in accordance with this chapter; and no fish weir, trap or wharf shall be erected or maintained in tide waters below low watermark in front of the shore or flats of another without the owner's consent, under a penalty of fifty dollars for each offence, . . .

R.S. ch. 110 § 99 (1911). The current statute remains largely unchanged. *See* 38 MR.S. § 1026 (2008).

3

## I. Factual Dispute

With one exception, the parties essentially agree on the material facts. The parties dispute whether the Britton property extends to low-water mark. It is well settled that an upland property owner whose deed includes "adjacent beach or flats, [and] designates a boundary as 'the sea' or 'the ocean' or an equivalent, and conveys 'to' or 'by' that boundary, nothing to the contrary appearing in the deed, the grant extends to low-water mark." *Ogunquit Beach Dist. v. Perkins*, 138 Me. 54, 60, 21 A.2d 660 (1941). In this case the Britton Deed clearly states that the lower boundary of their property runs to the York River.[4] Accordingly, this Court finds and concludes that the Brittons' property extends to the low-water mark.

## II. Scope of Riparian Rights

As discussed at summary judgment, the Court's analysis of the scope of the Brittons' riparian rights will focus on the degree to which the Donnells' use of the Lease granted by the State unreasonably interferes with The Brittons' common-law riparian rights.

At common-law littoral owners enjoyed certain riparian rights specific to their ownership. *Great Cove Boat Club v. Bureau of Public Lands*, 672 A.2d 91, 95 (Me. 1996). Among those rights, and the right specifically at issue in this case, was "the presumption that the owner of sea frontage has, in virtue of his ownership, the right of

---

[4] The 1975 Deed states in pertinent part:

> . . . thence running southwesterly by last named land to the York River; thence running southeasterly by said York River and dock one hundred five (105) feet, more or, to the road. . .

Pl. Ex. 10.

4

ocean access for the whole width of the frontage." *Robinson v. Higgins Co.*, 126 ME 55, 57, 135 A. 901 (1927).

These common-law rights have always been "subject to reasonable regulation by the State in the exercise of its public trust rights." *Great Cove Boat Club*, 672 A.2d at 95 (*citing Whitmore v. Brown*, 102 Me. 47, 56, 65 A. 516 (1906)). The parties in this case do not dispute that the State has such regulatory rights.

The Brittons assert, however, that the State's power to regulate the exercise of riparian rights does not confer on the Donnells the right to block the Britton's access to navigable waters anywhere across their entire river frontage. Thus, the Donnells are liable for damages and subject to injunctive and declaratory relief. Put simply, the Brittons assert that any interference with their right of ingress and egress to open water by a lessee under the State's Submerged and Intertidal Land Act (SILA), is an actionable violation of the Britton's riparian rights.

The Law Court has not had the opportunity to consider this issue. However, "[t]he nature and extent of the rights of the state and of riparian owners in navigable waters within the state and to the soil beneath are matters of state law to be determined by the statutes and judicial decisions of the state." *Fox River Paper Co., v. R.R. Commission of Wisconsin*, 274 U.S. 651, 671 (1927); *see also Capune v. Robbins*, 160 S.E. 2d 881, 886 (N.C. 1968). The *Capune* Court noted:

> *In the absence of any special legislation on the subject*, a littoral proprietor and a riparian owner, as is universally conceded, have a <u>qualified property</u> in the water frontage belonging, by nature, to their land, the chief advantage growing out of the appurtenant estate in the submerged land being the right of access over an extension of their water fronts. . . . (*emphasis added,* <u>emphasis in the original</u>).

*Capune, 160 W.E.2d at 886* (citations and quotations omitted).[5]

The SILA was revised in 1989 to specifically incorporate language requiring consideration of the rights of riparian owners in the State's leasing process in relation to other considerations. *See* L.D. 910, (114th Legis.. 1989).[6] That portion of the SILA has remained unchanged. *See* 12 M.R.S. § 1862(6)(d). Accordingly, a plain reading of the statute requires the Court to apply the standard of "reasonable use" to balance riparian rights, which are not absolute, versus the State's rights and interests under the SILA.

This reasonable use test has traditionally been applied in other situations involving "the reciprocal rights of riparian owners to stream flowage." *Poire v. Manchester*, 506 A.2d 1160, 1163 (Me. 1985)(*citing David v. Getchell*, 50 Me. 602, 604-605, (1862)). "Riparian proprietors have an equal right to use of water, and the right of each

---

[5]   The Law Court relied upon the *Capune* reasoning in *Great Cove Boat Club.* 672 A.2d at 95.

[6]   The 1989 Amendment reads in pertinent part (additions underlined):

> (6) The director may grant the proposed lease if the director finds that, in addition to any other findings that the director may require, the proposed lease:
>   a. Will not unreasonably interfere with navigation;
>   b. Will not unreasonably interfere with fishing or other existing marine uses of the area; and
>   c. Will not unreasonably diminish the availability of services and facilities necessary for commercial marine activates; and
>   d. Will not unreasonably interfere with ingress and egress of riparian owners.

*Id.* Testimony from the Director of the Bureau of Public Lands stated:

> [T]he proposed legislation will . . .2) yield a fair return to the State; 3) enhance public access; 4) protect the commercial marine industry infrastructure.
> . . .

> The bill will require individuals who wish to use the publicly owned submerged lands for private purposes to compensate the people of the State, not only with rental fees to support a management program, but by providing other, appropriate means of access and public compensation. In this way the use and enjoyment of the submerged lands will not be denied to anyone, but will in fact be made more widely available to Maine's citizens and visitors alike.

Leg. Rec. Senate Joint Stand Committee on Energy and Natural Resources, Hearing Date: April 10, 1989.

qualifies that of all the others; the question as between them is whether the use made by one is reasonable and consistent with the corresponding use by the rest." *Id.*

In this case it is uncontested that the State has a right to lease its submerged lands to both public and private interests with the directive to not unreasonably interfere with 1) navigation; 2) fishing or other existing marine uses of the area; 3) the availability of services and facilities necessary for commercial marine activates; and 4) the ingress and egress of riparian owners. 12 M.R.S. §1862(6). Thus, under the express statutory authority of SILA, riparian rights are limited or qualified to the extent necessary to effectuate the purposes identified by the statute, provided however that such limitations do not unreasonably infringe on riparian rights. See *Becker v. Bureau of Parks and Land*, 2005 ME 120 ¶4, 886 A.2d 1280, 1281.[7]

There is explicit statutory authority for the State to lease the submerged land in front of the Brittons' property for commercial purposes consistent with the criteria set forth in SILA. See 12 M.R.S. §1862(6). The question presented is whether the Brittons have proven that the limitations on their riparian rights created by the Donnells' wharfs are unreasonable under all the facts shown by the evidence.

In this case, the Donnells use the Lease to maintain a commercial marine facility. The facility supports fishing or other existing marine uses of the area and commercial marine activities. When the Brittons acquired their property, the Varrell Extension was in place. The Brittons' property is located on mud flats that limit the size and manner by which boats can access the property above the low-water line. The allotted space between the Varrell Extension and Simpson's Wharf is forty-one feet, sufficient to permit the Brittons to land a small boat. At present, under local ordinance, the Brittons

---

[7] If, as the Brittons assert, littoral owners have an absolute right to access across their entire frontage, then such owners can frustrate the purposes articulated by the Legislature in SILA.

are unable to build a pier to their property. The Donnell permits and lease are subject to modification if the Brittons obtain a permit for a wharf. The Court finds that the use made by the Donnells as lessees of the State is reasonable and consistent with SILA and that the Brittons have failed to prove unreasonable interference with their riparian rights.

### III. Other Claims

Because the Court finds and concludes that the Brittons have failed to prove that their reparian rights have been unreasonably infringed upon, likewise they have failed to prove a violation of the Wharves and Weirs Act. 39 M.R.S.A. §1026. Notwithstanding the language in the act requiring consent from an upland owner before a wharf can be erected in front of his shoreland, the Law Court has held that the act is subject to an "unreasonable infringement" analysis *Sawyer v. Beal*, 97 Me. 356, 54 A. 848 (1903). This is essentially the same analysis required under SILA. Given *Sawyer*, there is no conflict between the Wharves and Weirs Act and SILA. They both require that to support a claim for interference with riparian rights the upland owner must prove unreasonable infringement.

The entry will be as follows:

Judgment entered for the Defendants on Counts III, IV and V of the amended complaint.

Dated:     August 27, 2008

G. Arthur Brennan
Justice, Superior Court

PLAINTIFFS:
GERALD F. PETRUCCELLI, ESQ.
PETRUCCELLI MARTIN & HADDOW
PO BOX 17555
PORTLAND ME  04112-8555

DEFENDANT:
MAINE DEPARTMENT OF CONSERVATION
MARGARET A. BENSINGER, AAG
6 STATE HOUSE STATION
AUGUSTA ME 04333-0006

DEFENDANTS:
MARK FUREY, ESQ.
THOMPSON BULL FUREY BASS & MCCOLL
PO BOX 447
PORTLAND ME  04112-0447

ROBERT W. BRITTON, et al.,

         Plaintiffs


         v.                              **ORDER**


MAINE DEPARTMENT OF
CONSERVATION, et al.,

         Defendants


This case comes to this Court on remand from the Supreme Judicial Court of Maine, which partially vacated this Court's prior judgment. On remand this Court must determine whether the defendants' wharf constitutes a nuisance or violates the Wharves and Weirs Act, 38 M.R.S.A. §1026(2008). The remand order also directs this Court to consider certain affirmative defenses raised by the Donnells.

## BACKGROUND

Plaintiffs Robert W. and Eleanor F. Britton own property at 15 Simpson's Lane in York Harbor, Maine. The Brittons purchased the property from Edward Kennedy in 1975 and occupy it seasonally. The property is adjacent to the York River and has approximately 105 feet of river frontage at the low-water mark. The land abutting the river is a mud flat that significantly limits the size of boats that can be brought close to shore.

The defendants Daniel P. Donnell and the Trustees of the Donnell Realty Trust (the Donnells) own and operate two wharves extending parallel along the Brittons'

property boundary. The first wharf, Varrell Wharf, lies northwesterly of the Brittons' property and consists of two primary sections. One section runs parallel to the Brittons' property from the shore into the deep water. The second section is located in the navigable portion of the river just past the low-water line, and runs along the Brittons' frontage for forty-eight feet. Varrell Wharf has been maintained and operated in this configuration since 1955. When Daniel P. Donnell installed the second section of Varrell Wharf in 1955 he believed he had the absolute right to do so and did not need anyone's consent. (Oct. 15, 2008 Order at ¶ 3). Donnell never did obtain the consent of Edward Kennedy or his successors, the Brittons, for this second section.

The Donnells' second wharf is Simpson's Wharf, which parallels the Brittons' southwestern boundary as it runs into the river. The Donnell's purchased Simpson's Wharf from Edward Kennedy in 1962, and the deed included the right to dock boats on the wharf's northwesterly side. There is a forty-one foot gap along the Britton's river frontage between Varrell Wharf and Simpson's Wharf. This gap is reduced when boats dock along the northwest side of Simpson's Wharf.

From 1975 through the mid-1980's the Brittons docked two boats at Varrell Wharf. The parties had a disagreement that resulted in the Brittons making other docking arrangements. The Brittons also sought permission from the Town of York to build a pier from their property. The Town denied their application because the current zoning ordinance forbids the construction of a wharf from the Brittons' property. Nonetheless, the Brittons' have objected to the forty-eight foot section of Varrell Wharf running along their frontage since 1987.

The Brittons commenced this suit in 2005. At that time the Donnells entered into a Submerged Land Lease with the State of Maine pursuant to the Submerged and Intertidal Lands Act (SILA), 12 M.R.S.A. § 1862(2). When the Legislature enacted SILA

2

in 1975, the State gave pre-existing structures such as Varrell Wharf thirty-year constructive easements to continue operating. *Britton v. Dept. of Conservation*, 2009 ME 60, ¶ 7 n.4, 974 A.2d 303, 306 n.4. In 2005 the Donnells' constructive easement on the lands under Varrell Wharf expired, prompting the Donnells to obtain a lease from the State under SILA.[1] *Id.* The State granted them a lease over the Brittons' objection, "finding specifically that Varrell Wharf did not unreasonably interfere with the Brittons' riparian rights." *Id.* at ¶ 7, 974 A.2d at 306.

The Brittons filed a Rule 80C appeal from the State's decision, and also brought independent claims against the Donnells alleging nuisance and violations of the Wharves and Weirs Act, 38 M.R.S.A. § 1026. This Court dismissed the Rule 80C appeal as time-barred, and on motion for summary judgment determined that the State's lease did not preclude the Brittons' attempt to enforce their private rights. *Id.* at ¶ 10, 974 A.2d at 307. The Court also determined "that any claims alleging a continued interference with the Brittons' riparian rights, [including] the Wharves and Weirs Act, were not time-barred." *Id.* at ¶ 20, 974 A.2d at 309.

After a bench trial this Court issued judgment for the Donnells. *Id.* at ¶ 11, 974 A.2d at 307. The Court examined the facts under "SILA's unreasonable interference standard and found that . . . the interference with the Brittons' riparian rights was not unreasonable." *Id.* Absent unreasonable interference, the Court held that the Brittons had failed to show a violation of the Wharves and Weirs Act. *Id.* The Court did not address the Donnells' affirmative defenses. *Id.*

On appeal, the Law Court affirmed the dismissal of the Rule 80C action, but vacated the remainder of the judgment. The Law Court agreed that the statute of

---

[1] The lease contains a provision entitling the State to alter the location and/or docking arrangements on Varrell Wharf if the Brittons obtain permission to build a pier from the appropriate authorities.

3

limitations did not bar the Brittons' claims under the Wharves and Weirs Act, but it held that SILA's unreasonable interference standard did not provide the correct legal standard for deciding such actions. Rather, the Law Court held that the Wharves and Weirs Act is violated when a riparian structure is "so situated or [is] so near the shore of another as to injure or injuriously affect the latter in the enjoyment of his rights as such owner . . . ." *Id.* ¶ 23, 974 A.2d at 310 (internal quotations omitted) (quoting *Sawyer v. Beal*, 97 Me. 356, 358, 54 A. 848, 848–49 (Me. 1903)). On remand the Law Court instructed this Court to analyze the Brittons' Wharves and Weirs Act claims under the *Sawyer* standard, and to address the Brittons' nuisance claim and the Donnells' affirmative and equitable defenses. *Id.* ¶¶ 25–27, 974 A.2d at 310–11.

## DISCUSSION

The Brittons claim that Varrell Wharf injures their enjoyment of their riparian rights as a matter of law. They also attack the relevancy or applicability of the Donnells' affirmative defenses. The Donnells argue in turn that the Brittons have lost the ability to enforce their riparian rights through prescription, estoppel, abandonment, laches, or by coming to the nuisance. They alternatively argue that Varrell Wharf does not injure the Brittons' rights.

### 1.    The Wharves and Weirs Act

Under common law, the owners of property adjacent to navigable bodies of water hold special riparian property rights appurtenant to their estate in the land. *Great Cove Boat Club v. Bureau of Pub. Lands*, 672 A.2d 91, 95 (Me. 1996) (citing *Capune v. Robbins*, 160 S.E.2d 881, 886 (N.C. 1968)). These riparian rights traditionally included:

> (1) [T]he right to have the water remain in place and retain, as nearly as possible, its natural character, (2) the right of access to the water, (3) subject to reasonable restrictions, the right to wharf out to the navigable portion of the body of water, and (4) the right of free use of the water immediately adjoining the property for the transaction of business associated with wharves.

4

*Id.* (citing Kalo, *Coastal and Ocean Law* 119–20 (1991)).

The Wharves and Weirs Act protects these common law rights by providing waterfront owners with a statutory cause of action against anyone who erects or maintains a wharf or weir in front of another's property without permission. 38 M.R.S.A. § 1026; *Britton*, 2009 ME 60, ¶ 22, 974 A.2d at 309. However, this protection is not absolute. The Law Court in *Sawyer v. Beal* explained that the Act only protected a waterfront owner's existing riparian rights and did not create new ones. 97 Me. 356, 358, 54 A. 848, 848 (1903). Accordingly, a riparian owner can only maintain an action under the Act if "he is able to show that in some way he has been injured in the use and enjoyment of his land and shore by the construction of a [wharf] in front of his shore." *Sawyer*, 97 Me. at 358, 54 A. at 849. Quoting *Sawyer*, the Law Court stated that the proper test in this case is whether, considering all relevant facts, Varrell Wharf "is 'so situated or so near the shore' of the Brittons' property as to injure or injuriously affect the Brittons in the enjoyment of their riparian rights." *Britton*, 2009 ME 60, ¶ 25, 974 A.2d at 310 (quoting *Sawyer*, 97 Me. at 358, 54 A. at 848). The Brittons contend that *Proprietors of Maine Wharf v. Proprietors of Custom House Wharf* resolves this question in their favor. 85 Me. 175, 27 A. 93 (1892). In *Proprietors*, the Law Court upheld the equity court's determination that a wharf encroaching two feet into the plaintiff's riparian frontage was a nuisance. The Law Court stated that the injuries caused by the wharf would "be small, but would be many," and that the plaintiff was entitled to have its premises be clear of obstructions. *Id.* at 179, 27 A. at 94. The Brittons point to *Proprietors* and argue that if a two-foot encroachment merited an injunction in that case, than Varrell Wharf's forty-eight foot incursion along their riparian frontage must be a nuisance as a matter of law.

The Donnells correctly point out, however, that *Proprietors* presented factual and procedural circumstances that distinguish it from this case. In *Proprietors* both parties maintained active wharves on their adjacent properties. *Id.* at 177, 27 A. at 93. That case originated as an action in trespass after the defendant built a second wharf that encroached two feet along the plaintiffs entire property boundary and beyond into the navigable water. *Id.* After litigation the defendant removed the portion of the wharf covering land actually owned by the plaintiff to the low-water mark, but not the portion of the wharf built over riparian lands in front of the plaintiff's lot. *Id.* The plaintiff brought additional legal action to the Law Court to compel the defendant to remove the remainder of the wharf. *Id.*

The Law Court treated the riparian intrusion as an extension of the dry-land trespass. *Id.*, 27 A. at 94. In the Court's view, the action settling the trespass extended beyond the low-water mark to prevent the defendant from circumventing the practical effects of the injunction. *Id.* On these "and other facts stated in the bill" the Court granted judgment for the plaintiff. *Id.*, 27 A. at 93. The Law Court's extension of the right to exclude into the riparian zone was consistent with *Proprietors*'s assertion of a trespass action, and subsequent case law indicates that physical trespass on a riparian owner's upland property will render related occupancy of the riparian zone presumptively illegal. *See Perry v. Dodge*, 144 Me. 219, 67 A.2d 425 (1949) (plaintiff obtained injunction against operation of fish weir located below low-water mark in front of plaintiff's property with a leader extending onto plaintiff's shore). Absent upland trespass, this analysis is inconsistent with both the Wharves and Weirs Act and the Law Court's treatment of riparian rights as "a qualified property" or "appurtenant estate" subject to other competing rights. *See Great Cove Boat Club*, 672 A.2d at 95 (quoting *Capune v. Robbins*, 160 S.E.2d 881, 886 (N.C. 1968)).

Unlike *Proprietors*, this case does not present any allegations of physical trespass. This Court is instead presented with claims under the Wharves and Weirs Act, which require a different analysis, i.e. whether Varrell Wharf is injuring the Brittons' *enjoyment* of their riparian rights. Under this test, the first important distinction between *Proprietors* and the present action is that in *Proprietors* both parties had active, existing wharves. *See Proprietors*, 85 Me. at 93, 27 A. at 178. A review of other cases in which the Law Court has found riparian obstructions to be objectionable reveals that in almost all instances the riparian owner had or could build a wharf to access deep water. *Compare Robinson v. Fred B. Higgins Co.*, 126 Me. 55, 135 A. 901 (1927) (plaintiff cottagers' shore was rockbound and wharf was only safe way to reach navigable water), *and Coffin v. Town of Freeport*, 1989 Me. Super. LEXIS 61 (Mar. 29, 1989) (expansion of town wharf unreasonably interfered with plaintiff's twenty-six year old commercial wharf, restaurant, and lobster pound) *with Sawyer v. Beal*, 97 Me. 356, 54 A. 848 (1903) (fish weir did not interfere with navigation to riparian plaintiff's land), *and Whitmore v. Brown*, 102 Me. 47, 65 A. 516 (1906) (plaintiff gave no evidence that proposed expansion of defendant's wharf would impede access to plaintiff's land).

The second key distinction between *Proprietors* and the case at hand is the age of the challenged structure. The action in *Proprietors* was occasioned by the construction of a new wharf that encroached on the plaintiff's upland property. *Proprietors*, 85 Me. at 178, 27 A. at 93. This facet of *Proprietors* is consistent with later case law. In almost every action where an upland owner's riparian rights were violated, the offending structure was either newly proposed or newly built.[2] *See Robinson*, 126 Me. at 57, 135 A. at 902

---

[2] The lone exception is *Perry v. Dodge*, in which "[t]he defendant had maintained and operated a fish weir for several seasons" before the weir was challenged. 144 Me. at 219, 67 A.2d at 425. Prior to 1948 the upland owners had not objected to the defendant's weir. *Id.*, 67 A.2d at 426. In 1948 new owners acquired the property and immediately took action to eject the defendant's operation. *Id.* at 220, 67 A.2d

(plaintiff sued because defendant sought to extend the end of its wharf by thirty feet); *Coffin*, 1989 Me. Super. LEXIS 61 at ** 5–7 (Mar. 29, 1989) (town recently extended wharf by eight feet and reconfigured attendant floats); *cf. Whitmore* 102 Me. at 54–55, 65 A. at 519 (proposed expansion of defendant's wharf would not injure plaintiff's riparian rights).

Furthermore, in two of these cases the Law Court strongly implied that it would be difficult for plaintiffs to challenge long-established structures. While the plaintiffs in *Robinson* could challenge the expansion of the defendant's wharf, the Court also found that through inaction they had waived their right to challenge the existing wharf in front of their property. 126 Me. at 57, 135 A. at 902. The Law Court was even more explicit in *Whitmore* when it stated that the plaintiff could not bring equitable claims against twelve-year-old buildings and wharves. 102 Me. at 54–55, 65 A. at 519. Unlike *Proprietors* and other prior cases, in this case this Court is being asked to rule on a wharf that has existed in its current configuration for now almost fifty-five years, fifty of which were without legal challenge.

The facts before this Court are distinct and are not clearly controlled by prior case law. Furthermore, the test enunciated by the Law Court requires consideration of all the facts relevant to *this* case. In this case, the Brittons as riparian owners cannot legally construct their own wharf under the existing regulatory regime in York Harbor. Absent their own pier, the tidal flats in front of the Brittons' property restrict the types and drafts of watercraft the Brittons can use to access their land. This in itself may severely limit the enjoyment of their riparian rights, but such injury is caused by the town ordinances and the nature of their lot rather than the Donnells' wharf.

---

at 426. As discussed above, *Perry* also involved a physical trespass to the plaintiff's upland in addition to the claim under the Wharves and Weirs Act.

Absent a pier, the Brittons can realistically use only small, easily maneuverable watercraft to reach navigable water from their flats. Given the forty-one foot gap available to them, Varrell Wharf is not "so situated or so near the shore of the Brittons' property as to injure or injuriously affect the Brittons in the enjoyment of their riparian rights." *Britton*, 2009 ML. 60, ¶25. Absent such injury, Varrell Wharf does not violate the Wharves and Weirs Act.

## 2.    Nuisance

The Brittons also claim that Varrell Wharf constitutes a nuisance, though they acknowledge that the nuisance cause of action overlaps and is largely subsumed by their claim under the Wharves and Weirs Act. "The essence of private nuisance is an interference with the use and enjoyment of land." *Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 15, 722 A.2d 1269, 1272 (quotations omitted) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 87, at 619 (5th ed. 1984)). The Brittons contend that Varrell Wharf unreasonably interferes with their enjoyment of their riparian property rights. This Court disagrees and holds that Varrell Wharf is not a nuisance for the same reasons that it does not injure the Brittons' enjoyment of their riparian rights under the Wharves and Weirs Act.

## 3.    Prescription

Though the Donnells have not violated the Wharves and Weirs Act, in response to the Law Court's mandate on remand, this Court will address their affirmative defenses. The Donnells' first defense is prescription, namely that they have obtained the right to maintain Varrell Wharf in its current location through long and unchallenged use. The Brittons argue that riparian rights cannot be acquired or extinguished through adverse use or possession, and challenge the premise that the Donnells have been in "possession" of their property rights.

9

Riparian rights are a species of property right appurtenant to ownership of waterfront land, and they generally possess the usual attributes and incidents of property in land. *Great Cove Boat Club*, 627 A.2d at 95 (citing *Capune*, 160 S.E.2d at 886); *see Yates v. Milwaukee*, 77 US 497, 504 (1871) (stating that the "riparian right is property . . . though it must be enjoyed in due subjection to the rights of the public . . ."); 78 Am. Jur. 2d *Waters* § 32 (2002) ("While the exact nature of such [riparian] rights has been variously described, it is generally agreed that they constitute property rights, possessing the usual attributes and incidents of property . . . ."). They are analogous to appurtenant easements in that they are non-possessory interests vested in the riparian owner to use the public waters for specific purposes not allowed to the general populace. *See Great Cove Boat Club*, 627 A.2d at 94 (describing easements appurtenant). For example, landowners adjacent to a natural stream have the right to use and enjoy the water subject to the interests of their fellow riparian owners. *Lockwood Co. v. Lawrence*, 77 Me. 297, 316 (1885). Similarly, owners of shorefront property have rights to access the water in front of their property and wharf out to navigable water, subject to the public interest. *Great Cove Boat Club*, 672 A.2d at 95. Other courts have analogized these latter rights to a landlocked owner's right to access a highway. *Home for Aged Women v. Commonwealth*, 89 N.E. 124, 126 (Mass. 1909); 78 Am. Jur. 2d *Waters* § 153 (2002).

While no reported case in Maine has directly addressed the question of whether the riparian right to access deep water can be gained or lost through prescription, the Law Court has examined other types of riparian rights as affected by prescriptions. In *Lockwood Company v. Lawrence* the defendant sawmills claimed a "prescriptive right to the use of a stream beyond the general right of reasonable use" in common with the other riparian owners. 77 Me. at 319–20. Though the defendant in that case was

unsuccessful on the facts, the Law Court stated that a prescriptive right to use "the waters of another person" could be established through the same principles as a prescriptive easement in land. *Id.*

This principle was applied to the precise question currently before this Court in the Connecticut case of *McGibney v. The Waucoma Yacht Club, Inc.*, 182 A.2d 622 (Conn. 1962). In *McGibney* the Supreme Court of Connecticut was asked whether the defendant yacht club "had, by prescription, acquired enough of the plaintiff's private [riparian] rights of wharfing out and access to entitle it to maintain" certain floating docks that obstructed access to plaintiff's wharf. *Id.* at 565. The court answered in the negative because the defendant in that case failed to establish that it had maintained the floats continuously for the statutory period.

Together, *Lockwood Company* and *McGibney* stand for the proposition that riparian rights, including the right of access, may be acquired or limited through prescriptive use. *See also* 78 Am. Jur. 2d *Waters* § 363 (2002) ("A water right or priority acquired by appropriation may be lost by abandonment, laches, adverse use, or estoppel, but not by mere usurpation."). These authorities indicate that the Donnells' could legally acquire superior rights in the Brittons' riparian frontage through prescription. Prescriptive rights are acquired through "(1) continuous use (2) for at least 20 years (3) under a claim of right adverse to the owner, (4) with his knowledge and acquiescence, or (5) a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed." *Sandmaier v. Tahoe Dev. Group, Inc.*, 2005 ME 126, ¶ 5, 887 A.2d 517, 518 (quoting *Eaton v. Town of Wells*, 2000 ME 176, ¶ 32, 760 A.2d 232, 244).

This Court has already found that Varrell Wharf does not infringe on the Brittons' riparian rights. However, in the alternative, if Varrell Wharf did injure the

11

Brittons' enjoyment of their rights, there is no question that this injury has been maintained for over fifty years. The record shows that Varrell Wharf has operated year-round in its current configuration since it was constructed in 1955. The Brittons' predecessor, Edward Kennedy, knew of the wharf's presence and neither expressly approved or objected to it. From their purchase of the property in 1975 until approximately 1987, the Brittons did not object to the wharf. The only question, then, is whether the Donnells' use of the Kennedy/Britton frontage was done under a claim of right adverse to the riparian owners.

Maine's common law of adverse possession and prescription traditionally hewed to the minority rule of examining the "subjective intentions of the person claiming adverse possession." *Dombkowski v. Ferland*, 2006 ME 24, ¶ 13, 893 A.2d 599, 603 (collecting cases). Under this approach an adverse claimant's mistaken belief that it had the right to use or occupy the property in question would defeat the claim. *Id.* In *Dombkowski* the Law Court discussed 14 M.R.S.A. § 810-A (1993) and determined that the Legislature intended to abandon the common law's inquiry into the adverse claimant's subjective intent. *Dombkowski*, 2006 ME 24, ¶ 24, 893 A.2d at 605–06.[3] Accordingly, "'[h]ostile' simply means that the possessor does not have the true owner's permission," and "'[u]nder a claim of right' means that the claimant is in possession as owner, with intent to claim the land as [its] own, and not in recognition of or subordination to [the] record title owner." *Id.* at ¶ 12, 893 A.2d at 602 (quoting *Striefel*

---

[3]    While 14 M.R.S.A. § 810-A and *Dombkowski* are both directed at claims for adverse possession rather than prescriptive easements, it would be anomalous to alter the elements of the former without changing the latter. Adverse possession and prescription share common policy concerns, with their primary distinction being the exclusivity and extent of the property rights gained or lost. *See* Restatement (Third) of Prop.: Servitudes § 2.17 (2000) (cited in *Sandmaier*, 2005 ME 126, ¶ 8, 887 A.2d at 519. Additionally, the Law Court did not differentiate between the two claims when it defined the elements of "hostility" and "claim of right" in *Dombkowski*. 2006 ME 24, ¶ 12, 893 A.2d at 602.

12

*v. Charles-Keyt-Leaman P'ship*, 1999 ME 111, ¶¶ 13–14, 733 A.2d 984, 991) (quotations omitted).

Here the Donnells do not claim that they possess the *land* under Varrell Wharf because that title is held by the State. The Donnells inability to possess against the State, however, does not preclude them from occupying and claiming against the Brittons' private, non-possessory riparian rights over that public land. The record shows that the Donnells have not occupied the Brittons' frontage with any subjective hostility to the Brittons' riparian rights, but this subjective lack of hostility is not determinitive. This Court found that Daniel P. Donnell never sought or received Mr. Kennedy's or the Brittons' permission to maintain Varrell Wharf in front of their riparian land, making the Donnells' use of that area objectively hostile to the riparian owners. *See Dombkowski*, 2006 ME 24, ¶ 12, 893 A.2d at 602.

Similarly, in 1955 Daniel P. Donnell believed he had an absolute right to situate Varrell Wharf in its current location without anyone's consent. While the Donnells have since acknowledged the State's superior right to the lands under the wharf, they have never recognized that Mr. Kennedy or the Brittons might have superior private riparian rights to cross those lands and access the deeper water. This failure to acknowledge the riparian owners' rights satisfies the "claim of right" element. *See id.* The facts thus establish that the Donnells have continuously used or occupied the Kennedy/Brittons' riparian frontage for more than twice the statutory period with the riparian owners' knowledge, and have done so under an objectively hostile claim of right.

Assuming that Varrell Wharf injured the Brittons' riparian rights, the Donnells have gained a superior riparian right to the portion of the Brittons' frontage occupied by Varrell Wharf through prescriptive use. Without superior riparian rights, the Brittons do not have any claim against the Donnells under the Wharves and Weirs Act.

*See Sawyer*, 97 Me. at 358, 54 A. at 848 (stating that the Act only protects riparian owner's existing rights).

## 4. Abandonment

The Donnells' second affirmative defense is abandonment. The Donnells argue that the Kennedy/Brittons' long acquiescence to Varrell Wharf's presence evinces their intent to abandon their riparian rights over that portion of their frontage.

> "A party alleging abandonment of a right-of-way has the burden of proving, by clear and convincing evidence: (1) an act on the part of the owner of the right-of-way evincing a clear intention to abandon, and (2) an act by the owner of the servient tenement adverse to the owner's interest."

*Stickney v. City of Saco*, 2001 ME 69, ¶ 51, 770 A.2d 592, 609 (citing *Canadian Nat'l Ry. v. Sprague*, 609 A.2d 1175, 1179 (Me. 1992)). Mere nonuse is insufficient evidence of an intent to abandon, but "the acquiescence to the erection of a permanent barrier on a right-of-way can satisfy the burden of both prongs . . . ." *Id.*

The Brittons contend that Varrell Wharf is not a permanent structure obstructing their right to access the navigable waters, and therefore cannot establish their intent to abandon their riparian rights over the area in question. In the past the courts have found things like cottages and houses to be permanent obstructions, *see Chase v. Eastman*, 563 A.2d 1099, 1102 (Me. 1989) (cottage), *Fitzpatrick v. Boston & Maine R.R.*, 84 Me. 33, 24 A. 432 (1891) (houses), but have found driveways, weeds, or pastures insufficient to establish the requisite intent. *Stickney*, 2001 ME 69, ¶ 52, 770 A.2d 592, 610 (driveway); *Phillips v. Gregg*, 628 A.2d 151, 152–53 (Me. 1993) (overgrowth); *Bartlett v. City of Bangor*, 67 Me. 460, 466 (1878) (pasture and associated fence).

Varrell Wharf consists of floats attached by metal brackets to a series of pilings driven into the submerged riverbed. (R. vol. I at 47; R. vol. II at 20–21.) It has been in place for almost fifty-five years, and is commercially operated year-round. Given the

wharf's history, use, and substantial physical features, the wharf is a permanent structure obstructing passage along its length. Its presence and operation constitutes a permanent obstruction to the Kennedy/Brittons' water access, and its fifty years of unchallenged existence constitutes clear evidence of an intent to abandon the riparian rights to that portion of the frontage.

### 5. Laches & Estoppel

The Donnells also assert the doctrines of laches and estoppel.

> Laches is negligence or omission seasonably to assert a right. It exists when the omission to assert the right has continued for an unreasonable and unexplained lapse of time, and under circumstances where the delay has been prejudicial to an adverse party, and where it would be inequitable to enforce the right.

*Me. Sch. Admin. Dist. No. 27 v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 108, ¶ 16 (citing *Fisco v. Dep't of Human Servs.*, 659 A.2d 274, 275 (Me. 1995)).

While the Brittons' thirty-year delay in bringing their claim is arguably unreasonable, they correctly argue that this lapse has not prejudiced the Donnells' ability to defend the action. While the Donnells may have been prejudiced insofar as they now rely on the income from the challenged portion of Varrell Wharf, they have also benefited from that income. The facts do not support the Donnells' defense of laches.

Another variation on the theme of delay, the doctrine of "[e]quitable estoppel precludes an owner from asserting his legal title when, by his own action or inaction, he has cause another to act or to alter her position to her detriment." *Stickney*, 2001 ME 69, ¶ 44, 770 A.2d at 608. The record does not show that the Donnells acted or otherwise changed their position in reliance on the Brittons' long silence. In 1955 Daniel P. Donnell constructed Varrell Wharf in the belief that he had an absolute right to do so,

15

and that structure has not been altered since. Absent reliance, the Donnells' defense of equitable estoppel must fail.

## 6. Coming to the Nuisance

Finally, on remand this Court has been instructed to consider the applicability of the doctrine of coming to the nuisance. Generally, the fact that a nuisance condition existed when a plaintiff acquires its land does not prevent that plaintiff from bringing suit. *Eaton v. Cormier*, 2000 ME 65, ¶ 6, 748 A.2d 1006, 1008 (citing *Jacques v. Pioneer Plastics, Inc.*, 676 A.2d 504, 508 (Me. 1996)); Restatement (Second) of Torts § 840D (1979). Applied here, the Brittons are not barred from suing the Donnells for nuisance merely because Varrell Wharf was in place when the Brittons purchased their riparian property. Had the Court found that Varrell Wharf injured the Brittons, the fact that Varrell Wharf predated their ownership might weigh on the equitable remedies available. *Eaton*, 2000 ME 65, ¶ 6, 748 A.2d at 1008. However, this Court has not found that the Brittons are entitled to a remedy, and cannot address what effect the doctrine might have.

The entry will be as follows:

On the Brittons' claims for nuisance and violation of the Wharves & Weirs Act, judgment for the Donnells.

Further, the Donnells have established by the affirmative defenses of prescription and abandonment, the right to maintain their existing wharf.[4] The Donnells have failed to establish the affirmative defenses of latches, equitable estoppel or coming to the nuisance.

Dated: 1/15/10

G. Arthur Brennan
Justice, Superior Court

---

[4] Nothing in this judgment is meant to affect the State's authority to order changes to the Donnells' wharf under the S.I.L.A. lease.

PLAINTIFF:
GERALD F. PETRUCCELLI, ESQ.
PETRUCCELLI MARTIN & HADDOW
PO BOX 17555
PORTLAND ME   04112-8555

DEFENDANT:
MARK FUREY, ESQ.
THOMPSON BULL FUREY BASS & MCCOLL
PO BOX 447
PORTLAND ME   04112-0447